May it please the Court, Thomas Fink on behalf of Appellant Sam Joseph RICO. Your Honors, I'm here on Mr. RICO's behalf to challenge the District Court's denial of Mr. RICO's motion to suppress his car was stopped and Mr. RICO's challenge is that the reasonable suspicion. Counsel, just kind of as a preliminary question, has your client been released? The Bureau of Prisons website, no, the Bureau of Prisons website indicates that his release would be in July of this year. Thank you. And I have not heard from him to the contrary. But Your Honors, I'm not here to offer innocent explanations for each of the factors that the Border Patrol agent articulated as a basis for the stop. Obviously, that's not the law under our visa. But what distinguishes this case from our visa is that none of the factors that this Border Patrol agent cited are factors that from his experience are probative, from his experience are probative of either drug trafficking or alien smuggling. Even with the little car with the back end hanging down? He testified, Your Honor, that the car appeared to be heavily laden. He also testified on the record that from his limited experience, he had stopped six or seven vehicles. In that area? That's the only area that he had worked. And six or seven vehicles that met his description of having been heavily laden. And what he testified to, that in none of those cases, those six or seven cases, that those cars appeared to be heavily laden had he found either aliens or drugs. He said he hadn't. What cases of beer? Beer or groceries. What does that prove? That proves that that's not a particularly probative factor. We found that it is. The fact that you can load up a trunk with things that are not contraband doesn't mean that when you see a load-aligning truck, it's not more likely than some to contain contraband. That's not an indication that contraband might be there. It could be, but not based upon what this agent described as something as being heavily laden. I mean, if to him heavily laden means a case of beer or a couple bags of groceries, that's what his observations have led to. In addition to the supposed low-riding, heavily laden car, he also thought these people didn't look like locals, and he really couldn't check whether they were, and it was 1 o'clock in the morning. Do these add up to reasonable suspicion? Well, breaking those down, for example, 1 o'clock in the morning, when you compare that with Arvizu, I mean, in Arvizu, the agent said this happened at this particular time. That was 3 o'clock in the afternoon or something like that. That agent said that from his experience in Arvizu, that that coincided directly with the time when Border Patrol shift change occurred in this remote area, and that from that agent's experience in Arvizu, that smugglers, he knew the smugglers tried to coincide their trips with when shift changes occurred. This agent did not testify in the record that there was anything inherently suspicious about 1 in the morning. In other words, he can't testify that smugglers are more likely to smuggle at 1 in the morning as opposed to 10 o'clock at night or 6 in the evening. I mean, Border Patrol does not have authority to just say, well, this looked unusual to me. They have to say it looked unusual, and they have to connect the dot to say that it's unusual and it's probative, from my experience, of what we have authority or jurisdiction to do. Did he testify as to any Border Patrol experience beyond his own? That is, he factored in any training or any factors that had been imparted to him by others who had more experience than he? Just very rote. Just kind of very rote. I don't know whether it was rote or not, but did he, and if so, did any of those go to support his articulation? Not as to 1 in the morning. Certainly not as to the fact that these people did not look like people from the local area or basically testified they didn't look like Tohono O'odham Indians to him. The only thing that he testified to that would meet what you're describing, Judge, is that this vast area, which only described an area from the border 30 miles to the north, was just an area where there was a lot of smuggling. And, you know, and here again, he Why wouldn't that factor in? Well, I think there has to be more. For example, he first sees this, the first time he sees this vehicle is at an intersection 30 miles from the border. Yeah, but it's coming off the reservation. He doesn't, he doesn't know that. He only sees it at, and that's another difference from Arvizu. In Arvizu, the Border Patrol agent testified that there was sensor activity twice off of a dirt road that led to the border from the border and in Arvizu that he hit that sensor twice and the week before or some weeks before they had pulled a minivan, same type of cars in Arvizu, that had hit those sensors and they took off a load of drugs. So I don't think Arvizu, my reading of the Supreme Court's opinion was not that they were making a fact-bound decision of, you know, that everything now was, had to be equivalent to Arvizu. What they did make quite clear is one looks to the totality of the circumstances and you can't break it down. And I think we're acutely aware since it was our jurisprudence that they were examining. And I'm not here, I'm not here as you're, you're not hearing me offer, you know, breaking it down and offering innocent explanations. I'm saying that this man did not connect that dot from things that he saw to, to something that's probative of smuggling. So the fact that, to answer your question, he saw this vehicle, the only person to see this vehicle, 30 miles from the border for the first time. Not coming from the border, not anywhere near the border, not off of a dirt road that comes anywhere on the border, not having hit a sensor, not even being dusty or dirty to indicate that it had been off-road near the border. And that road, as in the record indicates, that road is a road that proceeds 30 miles to the border. The entire way it's, it's a paved road. And then there are other villages and there are things that come off of that. But it dead ends at the border, right? I'm sorry? It dead ends at the border. That, yes, correct. And there's no border checkpoints there. Correct. So if you're going to be coming from that, if you go there, the only place you'd be coming from would be the reservations. Unless, I guess, you went in the desert, you know, to the end of the road and, what, camp or something? I don't know. Correct. I don't know. I don't know. I mean, do people camp there? I have no idea. People camp at, I don't, but people camp at all sorts of crazy places and you could, you could camp there. Do you need the plug-in for your, for the plug-in, I don't know. You sound like you're as experienced as I am at camping. Exactly. But, you know. Probably even less. Yeah. But, but, you know, there again, what he, you know, I mean, I, really what, what really happened here is he had a, a very inexperienced agent who did not have, you know, experience to draw from and, and what his report stated and what he testified to at the trials, he saw people that did not look to him like they were from that area and that's an Indian reservation. Okay. And what, what do you make of that? I'm sorry? What do you make of that? Well, I, I think. Let's say they were wearing turbans. Let's say they were wearing turbans? Well, I'm just. Yeah. I mean, you know, something that would clearly make them not Indian. I don't think Indians were, I mean, you know, headgear that makes them clearly not coming off the reservation. Now let me, let's say that's very clear. I mean, Indian or Sikh kind of turbans, right? And so he sees a bunch of Sikhs in a car where the only place you can reasonably be coming from is the reservation in the middle of the night. So you could say, well, they don't look to me like, you know, they look Sikh. They don't, they don't look, they don't look, uh... You're saying, you're saying Sikhs don't camp? You're saying Sikhs don't camp, then? But I agree, right? That, that would make his... Well, I was looking for a more dress that would clearly make him not be, you know, something that would clearly make him look like a not from the reservation. What do you make of something like that? That would make his observations under... In the middle of the night. His observations under those circumstances that you posited would be more probative of someone not from the reservation being on the reservation. You could say, look, they obviously don't, you know, live on the reservation. They're coming, it's one o'clock in the morning. They very likely were visiting somebody at the reservation at one o'clock in the morning. And so that looks suspicious to me. So, so, here he says they look like they are not from the reservation in a different way. And he, it's such a, you know, visual appearance thing. And I, I don't know what people on the reservation look like. He tells us that, that they don't look like people from the reservation. What do you make of that? I think he, I think his, uh, and I think the district court did not give weight to that because his observations and his gross over generalizations about what people who do come from the reservation look like. You know, they have broad features, dark skin, broad nose, broad foreheads, things like that. His over generalizations of what people look like who do come from the reservation as compared to my client, you know, were, you know, he wasn't, are, are, are relatively meaningless and certainly much less probative than what you posited, posited. You know, so I, I just don't think that, that that factor that he cited, you know, is, is as described by his objective observations is very probative. And, you know, I think that, um, you know. Okay. Uh, you're over your time. Why don't we hear from the government? Thank you. We need a little time for a button. Good morning, your honor. May it please the court. Elizabeth Berenger, assistant U.S. attorney on behalf of the United States. The district court here properly found that agent group made a, a good reasonable suspicion determination in this case. Although defense counsel acknowledged that it's, it's all the totality of factors, he still tries to parcel out those different factors instead of looking to the overall circumstances. There were circumstances to support reasonable suspicion in this case. First, the characteristics of the area cannot be overlooked. It was 1 a.m. in the morning, much like Diaz-Juarez, that this court decided on a remote two-lane highway leading from the border. As Judge Kosinski noted, it dead-ended at the border. There were roots and dirt trails, breakthroughs in the international fence line that the, the agent testified that drug smugglers and human traffickers used to enter, as well as mountain ranges on both sides of the roads with trails that the aliens used to go into three Native American villages along that road that served as layup spots where the illegal aliens would wait for rides. The highway did not pass any cities, area attractions, or national parks. There's no evidence in the record that there's any camping. In fact, to the contrary, it said that there isn't anything to do down there. There was a high-intensity drug trafficking and alien smuggling area. That particular intersection had an observation tower, a chase vehicle, a tower operator, because of the high incidences of drug and alien smuggling. It was the only way out to northern cities, such as Phoenix and Tucson, from this very remote location in southern Arizona. So are you suggesting that essentially anybody driving at that time of the early morning in that area, that's, as far as you've gone, enough for reasonable suspicion? Most definitely not. The thing that, in this case, it was this particular intersection at 1 a.m. in the morning combined with the aspects of the defendant's vehicle and the appearance of the driver. So it wasn't just that a car was traveling on that road. It was more that it was very unusual to encounter traffic in that area, which in Diaz-Juarez, they found that that was an objectively identifiable fact. Again, the aspects of the defendant's vehicle, as Judge Fletcher noted, it was heavily laden. The officer testified that in his training experience, that meant, and especially in his training, we can't overlook training, that that meant that contraband could be in the trunk, and that's on ER 21 and 22. Also, there was no license plate, so he couldn't figure out. Usually what he'd do is run the license plate to determine. Before you move on, what do you make of the argument, though, that in his personal experience, each time he had jumped on that heavily laden trained factor, it all turned out to be innocent? In that area, is that true? Is that what he had testified to? He did testify that in all the times that the vehicle had been heavily laden, he hadn't found contraband, but he said there had always been something in the trunk. And then he testified that in his training over the past 10 months, including a 16-week border patrol academy and five months of ride-along with another officer, that the knowledge had been imparted to him that that could be a factor that indicated that illegal contraband was in the trunk. So he was trained in theory, and in practice, he had how many incidents of actual empirical evidence that it proved nothing more than there was beer and groceries in the trunk? But there was always something in the trunk. And the officer isn't as inexperienced as defense counsel would suggest. This officer had been stationed in a very remote location for the past eight months, in and out. The trial judge was very familiar with this area of Arizona and the experience level in Arizona, its chief judge role from Arizona. And this isn't a small level of experience for a border patrol agent down there. It's not like he was the first day out of the academy. Counsel, what would make of the fact that the officer thought that you had to have a permit to be driving in this area?  And the judge didn't cite it in his reasonable suspicion determination. So does that affect the reasonableness of his thinking that this was smuggling? It doesn't. There were enough factors there to have reasonable suspicion, even without his mistaken belief that people needed a permit to be on the reservation. And Judge Rohl did not cite that in his reasonable suspicion calculus. He found enough without that. A question. They brought the dogs and the dogs said that they said about them that there was a change of behavior in the dogs. What does that mean? There isn't enough in the record to really support what that means. But basically, I'm assuming that the dogs indicated on the vehicle. So. Are they taught to alert for human cargo? Again, this isn't in the record, but I believe that they have dogs that do both drugs and human. So we don't really know. We don't know. Okay. The license plate, again, was another objectively identifiable fact in the totality of circumstances determination. The agent testified that he would usually run the plates and the plates would usually return back to a Cells, Ajo, or Y, which are sort of nearby cities, aren't really cities, really small towns, that the local residents use. And he couldn't dispel the suspicion, much like Adams versus Williamson, that there wasn't any license plate here. And finally, the appearance of the driver did contribute to agent group's reasonable suspicion. He had been working there in this very remote location for eight months, day in and day out, as I already mentioned. And he just, based on the appearance of the driver, he didn't believe they were from the local area. And Judge Roll acknowledged that this might not have been a very heavily weighted factor, but it definitely factors into the reasonable suspicion. I have a hard time believing that people coming from south of the border look all that different from people living north of the border. I mean, in a way that you could identify shining a light in the car, or sort of looking at a car that's moving at one in the morning, I assume this is not an area with heavy lighting. It's probably pitch black, right? Actually, the evidence was that there was adequate lighting, because from the trial testimony, not the motion to suppress hearing, not both his headlights and his takedown lights were shining into an open window, and the defendant was actually stopped in the intersection. It's his lights. There's no street lighting. That's correct. I have a hard time believing that they looked that different. Right. Well, based on his testimony, he just believed that he didn't appear to be from the local area. It was both facial hair and facial features. It's just part of what comprised his reasonable suspicion calculus. He believed that they looked different. Since they were given the time, could you address the sentencing issue? Yes, Your Honor. The district court here incorrectly concluded it lacked the authority after Booker to impose the guideline enhancement. And that's the only issue in the government's appeal, is whether the court believed it was the day or two after Booker was decided whether it incorrectly believed it lacked the authority. As the government, I hope you receive the 328-J letters. It's an interesting case. I mean, the jury finds no enhancement, right? That's exactly what happened in Booker. I mean, in Watts, excuse me. That's exactly what happened in Watts. So. Is there any indication from the judge that he wouldn't make the enhancement anyway? There was actually a lot in the record that he would impose the enhancement, although he didn't make a specific finding. On SCR 24, 26, 55, and 68, he all made comments suggesting that he believed that dangerousness may have been a factor despite the jury verdict. So, and we're not even arguing the merits of what Judge Rollwater would have not decided. We just want him to make a finding under a correct belief of his authority. And I hope the court received the 328-J letters in this case with later authority, such as Johnson and Lynch saying Booker did not affect the rule of Watts, and that Williamson, which is addressing the defendant's reply brief, that there are no ex post facto problems for the result from the application of Booker. So if the court doesn't have any other questions, you could ask the connection. Be affirmed and the sentence be vacated and remanded. Thank you. If you wish to take a minute for a bottle, I will give it to you. Do you have anything on the sentence? Your Honor, I would say I owe a duty of candor to the court. I mean, this is a very unusual situation. Judge Roll understood, it's clear in the record, Judge Roll understood at the time of sentencing that the sentencing guidelines were, in fact, advisory. This is not an amyline issue where the court has to consider remand to see what the district court judge would do had he known that the sentencing guidelines were advisory. Judge Roll clearly understood that the guidelines. Well, but the issue is whether you can use factors where there's been a finding by the jury that these are not supported. Acquitted conduct, yes. And I don't know that this court has directly addressed that issue since the time in Watts. So, I mean, I really have nothing to add to that. I think that, you know, in candor to the court, it does appear that Watts is still good law. If the court, obviously, I'm supremely confident in my appeal on the suppression issue, but if I were to fail on that, then I think that the court in candor would remand to the district court given the fact that the district court apparently under the law, is wrong under the law and was mistaken about considering acquitted conduct. I just, in just, as far as, you know, the other factors cited by the government and its argument about the presence or absence of reasonable suspicion. And one more thing we just didn't address, and I'll sit down, is, for instance, the presence or absence of a license plate. I mean, there's nothing that this agent did not testify from his experience. It's, we understand the license plate. I mean, it's a sort of a negative factor. It's if he'd had a license plate, then he might have been able to allay some of the suspicion by running the plate. And what you're saying is a normal situation, that's what he would do, and contributing to the sound of the circumstances is that he couldn't do this. I don't think that's unreasonable, is it? Well, but the fact that he couldn't do it doesn't mean that that vehicle is more likely to be carrying drugs or aliens. I mean, it's not probative of that. I mean, if he could testify from his experience that smugglers typically, or I think we understand the point. Thank you very much. Thank you. The case is signed. You will stand submitted.
judges: B. Fletcher, Kozinski, Fisher